

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 5, 2021

**VIA ECF & E-MAIL**

Hon. J. Paul Oetken
United States Courthouse
40 Foley Square
New York, New York 10007

    Re:    <u>United States v. Scott Robinson</u>, 20 Cr. 162 (JPO)

Dear Judge Oetken:

    Scott Robinson ("Robinson" or the "defendant"), for almost a decade, led a scheme to profit from the creation, marketing, sale, and distribution of illegal adulterated and misbranded drugs across the country, including anabolic steroids and performance-enhancing drugs ("PEDs") marketed to racehorse trainers, veterinarians, and others. These drugs were not manufactured in sanitary, government-approved facilities; they had not been tested and approved for use in humans or animals by the Food and Drug Administration ("FDA"); they were not distributed pursuant to lawful prescriptions; nor were they properly labeled with, among other things, manufacturer information, directions for use, ingredients, or other details designed to ensure that users can mitigate adverse reactions to particular drugs,[1] and that a contaminated or harmful batch of drugs can be traced back to its production facility and recalled before similarly-contaminated drugs cause illness or injury in other users. Robinson—with full knowledge of the FDA's requirements—nonetheless advertised and sold these illegal drugs online through various business entities and direct-to-consumer websites, specifically targeting those in the racehorse industry seeking a competitive advantage. Robinson's businesses then sold these drugs, including injectables, to non-veterinarians, despite the risks of harm to the receiving animals from being administered drugs by laypeople who, in many cases, were acting not in the best interest of the patient, but to compel an animal under their care to perform beyond the animal's natural abilities by increasing their speed or masking their pain or injuries.

    The defendant and his co-conspirators took elaborate steps to conceal the nature and effect of their cheap PEDs. They were able to offer discounted prices on certain "knock-off" products that purported to offer the same effects as FDA-approved counterpart drugs precisely because they did not engage in the rigorous drug approval and registration process required under the Food Drug

---

[1] For example, the ingredients of a particular drug are relevant for human or animal patients with allergies, a history of negative reactions to a particular substance, or those receiving other medications that may cause an unexpected side effect when interacting with the drugs sold by Robinson.

and Cosmetic Act—processes designed to ensure the health of humans and animals receiving drugs.  Robinson's businesses made millions of dollars in revenue by disregarding these regulations and continuing to distribute adulterated and misbranded drugs with impunity. Even after Robinson was confronted by law enforcement, months prior to his arrest, he continued that activity, going so far as to threaten the obstruction of this and other investigations if he was not permitted to secure the return of electronic devices and drugs seized from his illegal premises.

For the reasons explained herein, the defendant should receive a significant period of incarceration, consistent with the parties' stipulated Guidelines sentence.

## I. Procedural History

In September 2019, the FBI executed a search warrant on premises associated with Robinson's then-operational drug manufacturing business. By that point, Robinson had met with FBI agents in an attempt to cooperate in their investigation. Robinson, incensed by the FBI's disruption of his illegal business, attempted to extort the federal agents involved in the seizure by threatening to release a letter to certain members of the racehorse industry informing them of the existence and scope of the FBI's investigation if the FBI did not immediately return his electronic devices the same day they were seized. After being informed that his threat was itself a crime, Robinson retracted his threat hours later. (PSR ¶¶ 28-29).

On March 9, 2020, Robinson was arrested on the charges in Indictment 20 Cr. 162, namely, two counts of participating in conspiracies related to his distribution in interstate commerce of adulterated and misbranded drugs with the intent to defraud and mislead, in violation of Title 18, United States Code, Section 371. The charges were based on his operation of several businesses and websites dedicated to the marketing and sale of performance-enhancing drugs to members of the public, particularly those in the racehorse industry.  As set forth in the Indictment and the Presentence Investigation Report prepared by the United States Probation Department (the "PSR"), Robinson, who is neither a veterinarian nor a pharmacist, nonetheless advertised and sold a wide variety of drugs, including blood builders, used to increase red blood cell counts and/or oxygenation to stimulate a horse's race performance and recovery; analgesics, designed to block pain, which can mask physical injuries; and red acid, similarly used to reduce inflammation in joints and reduce pain.  (PSR ¶¶ 17 n.2, 22).

Thereafter, on September 16, 2020, Robinson pleaded guilty pursuant to a plea agreement to a superseding Information charging Robinson for a single, encompassing count of participating in a drug adulteration and misbranding conspiracy, in violation of Title 18, United States Code, Section 371.

## II. The Presentence Report

The PSR calculates the defendant's adjusted offense level as 29.  (PSR ¶ 46).  Although the defendant does not have any prior convictions, he was court martialed in 1998 while enlisted in the U.S. Navy for wrongful use of a controlled substance, for which he was found guilty and penalized. (*Id.* ¶ 48). As the defendant admitted in statements to law enforcement, this offense related to his resale of steroids to other enlisted members of the Navy, indicating that the defendant

has been on notice as to the illegality of his distribution and sale of drugs for over two decades, and long before the conspiracy charged in the Information. The PSR also reflects that the defendant was arrested, but never convicted, for disorderly conduct in connection with his attack on another individual at the Hoosier Park Track and Casino related to a dispute over a debt. (*Id.* ¶ 53).  The PSR, consistent with the plea agreement, finds that Robinson's Sentencing Guidelines range is 87 to 108 months' imprisonment; however, because the statutorily authorized sentence is 60 months, the defendant's Guidelines range correspondingly lowers to 60 months' imprisonment, pursuant to U.S.S.G. § 5G1.1.  (*Id.* ¶ 7, Page 4). The Probation Office recommends a sentence of 36 months' imprisonment.  (*See id.* Sentencing Recommendation at 30).

### III. **Defendant Submission**

The defendant's submission, and the appended letters of support and exhibits, seeks a non-custodial sentence from the Court.  (*See* Robinson Sentencing Subm. ("Def. Mem."), Exhibits 1-22).  Robinson first argues that it is statistically unlikely that he will reoffend again given that he has no prior criminal history, and further argues that a felony conviction alone, compounded by the collateral consequences of such a conviction, is "more than sufficient punishment" without any period of incarceration. (*Id.* at 2-3).

As discussed further below, the defendant's emphasis on his lack of prior convictions is significantly undermined by the fact that he engaged in numerous criminal schemes to misbrand and adulterate drugs over the course of approximately a decade, resulting in investigations by multiple different jurisdictions into his misconduct. He continued in that criminal activity even after intervention by law enforcement, and attempted to thwart the investigation resulting in this case through threats directed to law enforcement officials.  The defendant has spent a sizeable portion of his adult career engaged in the criminal offenses; his calls for leniency ring hollow given his extensive involvement in these illegal enterprises.

Further, the defendant's professed affinity for racehorses as set forth in his submission, (Def. Mem. At 4-5), is belied by his near decade-long business model that treated those animals as disposable commodities to be used in the pursuit of race winnings by unscrupulous trainers. The Court should give no weight to Robinson's argument on this point, premised as it is on the self-serving and naïve notion that Robinson's actions posed no harm to racehorses and other animals that were injected with medically unnecessary drugs, manufactured in unsanitary facilities, administered by self-interested laypeople angling to win races. (*Cf.* Def. Mem. Exhibit 1 at 2 (Letter of Support from Robinson's psychologist opining on Robinson's "love for racehorses"); *id.* Exhibit 6 at 1 (opining on Robinson's concern for "the way some horses are treated" in racing)).  The claim in one such letter that Robinson spoke "in very pejorative terms about others who 'dope'" racehorses, (*id.* Exhibit 1 at 2), contradicts the slate of products Robinson offered for sale, and Robinson's own statements to law enforcement, in which he admitted to procuring Aranesp, a blood builder with effects similar to Epogen, a widely banned blood-building drug, to a Standardbred racehorse trainer for administration to a horse in advance of a race.  The only purpose for the non-medical administration of a blood-building drug to a horse before a race is to enhance a horse's performance, which is squarely at odds with Robinson's supposed disdain for racehorse "dopers."  Some of the products Robinson offered for sale included "Blast Off Red," advertised on the website www.horseprerace.com as a "an

extremely potent blood builder injection" that "WILL NOT TEST," (Exhibit A),[2] and "Blast Off Extreme Injection," another drug advertised to "increase the force of heart muscle contraction, thereby increasing blood flow and oxygen to the muscles in Race Horses, Greyhound, Dogs, and Camels," (Exhibit B),[3] and "Numb It Injection," another injectable drug advertised as the "most powerful pain shot on the market today AND WILL NOT TEST" even if administered "as close to the event as possible, but no closer than 1.5 hrs," (Exhibit C).[4] Far from decrying "dopers," Robinson catered to them through his various ventures, and reaped millions of dollars in sales from these businesses.

Nowhere in the defendant's submission does he express remorse or contrition for having engaged in the offense conduct. The closest the defendant comes to apologizing is in the conclusion of his submission, where he acknowledges that he had previously apologized to those involved in the investigation regarding his attempted obstruction of justice, while arguing to the Court that the agreed-upon enhancement for obstruction of justice—which was included in the parties' plea agreement and is not in dispute—should nonetheless be discounted. The defendant's failure to genuinely acknowledge his culpability underscores the need for individual deterrence, as argued below. The defendant clearly has not grappled with the extent of his criminality or the danger inherent in his illegal drug distribution, a fact that counsels strongly in favor of a significant sentence, if only to ensure specific deterrence and public safety. A significant sentence from this Court would send the message that the criminal justice system takes Robinson's conduct seriously, even if he does not.

## IV. Sentencing Factors

### a. Applicable Law

Although *United States v. Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. 220, 264 (2005). As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

---

[2] This drug, like many others advertised online by Robinson and his co-conspirators, was recommended for use in dogs (on average, greyhounds can weigh between approximately 60-88 lbs.) as well as horses (on average, horses can weigh between approximately 700-1,200 lbs.), even though there was only a single dosage recommendation (5-10 mls). The imprecision as to the proper dosage for dogs, which weigh magnitudes less than horses, reflects the defendant's indifference to the harm these animals could have faced by a layperson's administration of these drugs in reliance on Robinson's dosage recommendations, to say nothing of non-veterinarians who may have decided to exceed those recommendations.

[3] This drug, too, was advertised for use on "Race Horses, Greyhound, Dogs and Camels," yet contained only a single dosage recommendation ("30 mL given 4-6 hrs prior to anticipated exercise").

[4] Alarmingly, this drug is advertised for use on "horses, cattle, sheep, swine, camels, alpacas, *and pigeons*," (Exhibit C (emphasis added)), yet also contains a single dosage instruction ("Administer 10 ml by intravenous injection . . . .").

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims."  18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### b. Discussion

The 18 U.S.C. § 3553(a) factors particularly applicable here include the need for the sentence to reflect the nature and seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct to the defendant and those similarly situated.  Under the circumstances, the Government believes that a Guidelines sentence of 60 months' imprisonment is appropriate here.

First, a substantial sentence is needed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment.  *See* 18 U.S.C. § 3553(a)(2)(A).  Robinson repeatedly engaged in various businesses that manufactured, marketed, and sold custom-made drugs to non-veterinarians, choosing to ignore the risks involved in distributing drugs that were administered to animals without regard to the medical necessity of administering such drugs, without the oversight of a licensed veterinarian, without conforming to sanitary manufacturing practices, and without seeking requisite FDA approvals to ensure the drugs were safe. Robinson likewise sold anabolic steroids marketed to human athletes with little regard for the safety or propriety of marketing and selling such PEDs for performance-enhancing (non-medical) purposes, without the oversight of a doctor.  Robinson and his co-conspirators did so seeking substantial financial gain, with little regard for the dangers inherent in their practices.

The severity of the consequences of distributing unsafe drugs is illustrated in complaints Robinson received in response to shipments of drugs that were unsanitary.  For example, between at least December 2015 and January 2016, a series of customers complained about a particular product distributed by Robinson and others, stating, among other things, that a mare who had been injected with Pentosan by a first-time user of this product "did not want to move at all and could

not raise her head"[5]; another individual stated that after two horses received the injection, "for about 36 hours . . . both my horses act like they are heavily sedated, can barely walk," and the user administered the product "three times"[6]; a third user reported that after injecting the horse with Pentosan, the horse experienced a stiff neck, which a veterinarian later identified as possibly caused by "some impurity in the batch."[7] (*See* Exhibit D).[8] Robinson was dismissive of these complaints. (*See, e.g.*, *id.* (Robinson: "And board of pharmacy worries about u? They got bigger problems! Lol")).[9] Robinson—despite raising his own concerns with impurities in the products he sold months earlier—turned a blind eye, demanding no accountability or serious reform. (*See, e.g.*, *id.* (Robinson: "R u making stuff different? I have a lot of stuff that doesn't look same and has stuff floating in it. Blood building peptide has black particles"[10]; Robinson: Employee "has been complaining of bugs coming out of boxes u send. I told him he was crazy until I found one floating in bottle today when labeling. Better check everything because you might have fruit fly or Nat [sic] problem down there. There shouldn't be a way a bug can get into a crimped bottle."[11]).

Robinson's concerns with his co-conspirator's manufacturing practices, outlined above, long predated a February 2016 report issued by the Florida Department of Health Records ("DOH") suspending Scott Mangini's Florida pharmaceutical license, following a December 2015 inspection of the office space used by Mangini to manufacture the drugs Robinson and Mangini sold together. (*See* Exhibit E).[12] The report cited multiple serious deficiencies in Mangini's practices. (*See id.*). For example, the DOH found that, "[i]n order to maintain sanitary conditions of pharmacy equipment and personnel an adequate sink in workable condition with running water . . . must be available"; Mangini's company, in lieu of an operational sink, had only "a ten gallon bucket of water to use for hand washing." (*Id.* at 2-3). The DOH further found "numerous unsanitary conditions," including "open and unlabeled active pharmaceutical ingredients (API) which was subject to contamination, and a layer of dust and powder throughout the prescription counter and floors" that were "so dirty . . . an Investigator was able to write the initials 'DOH' with an alcohol swab on the pharmacy floor." (*Id.* at 3). The DOH also found multiple expired medications and mislabeled syringes filled with medications that Mangini had compounded

---

[5] The message relaying this complaint was sent from Robinson to Scott Mangini on or about December 22, 2015.

[6] The message relaying this complaint was sent from Robinson to Mangini on or about January 2, 2016.

[7] The message relaying this complaint was sent from Robinson to Mangini on or about January 4, 2016.

[8] Exhibit D consists of a selection of WhatsApp chat messages between Robinson and Mangini, retrieved from Robinson's cellular phone. The Government respectfully requests that this exhibit be filed under seal pursuant to the Court's protective order. (*See* ECF No. 18). This exhibit has been provided to the Court and defense counsel simultaneously by email.

[9] This message was sent from Robinson to Mangini on or about December 29, 2015, after the Florida Board of Pharmacy had conducted an inspection of the office space used by Mangini to manufacture drugs.

[10] This message was sent from Robinson to Mangini on or about May 5, 2015.

[11] This message was sent from Robinson to Mangini on or about March 30, 2015.

[12] For the same reasons articulated with respect to Exhibit D, the Government respectfully requests that this exhibit also be filed under seal. This exhibit has been provided to the Court and defense counsel simultaneously by email.

himself. (*Id.* at 3-6). The DOH further found that Mangini maintained no recordkeeping and distributed prescription drugs, including at a local racetrack. (*Id.* at 7-8).[13] Robinson, who was on notice as to at least some of these issues months earlier, was indifferent to the animals who were at risk of harm by these unsanitary practices.

Second, a substantial sentence is necessary to afford adequate specific and general deterrence, and to afford the public protection from Robinson's commitment to the continuation of these dangerous schemes. *See* 18 U.S.C. § 3553(a)(2)(B) & (C). With respect to specific deterrence, Robinson has engaged in the same type of conduct, illegally distributing adulterated and misbranded drugs, for years, through various ventures and in conjunction with various co-conspirators, with little interruption between Robinson's illegal enterprises. His repeated, persistent criminal offenses are all the worse because the defendant was fully aware that what he was doing was wrong. Although the defendant was quick to accept responsibility in this matter and enter a plea of guilty, his conduct even while he was fully aware of the FBI's investigation into his illegal business raises questions as to his commitment to leave his criminal past behind. After federal agents had executed a search warrant on premises used by Robinson in September 2019 and seized, among other things, adulterated and misbranded drugs stored by Robinson, Robinson took steps a few months later, in December 2019, to revive his manufacturing business. Specifically, Mangini purchased mixing equipment designed to be used, and which Robinson intended to use, to mass-produce the prescription drug omeprazole. ███████████████ Quite clearly, specific deterrence in the form of imprisonment is required for Robinson in particular. The

---

[13] The safety concerns underlying such unsafe practices were explicitly cited in this report, which stated: "Without the safeguards of sanitary conditions, audit trails and strict adherence to [requisite] standards . . . the public is at risk of the serious dangers, including death, associated with products originating from unsafe and unsanitary pharmacies. . . . A patient is unable to discern whether the medication he receives from a pharmacy is safe or dangerous, especially because the primary danger of contamination occurs at the microscopic level. It is therefore essential for pharmacists that prepare and sell medications to ensure that their practices and procedures are in strict conformity to the standards that have been set forth to minimize the inherent risk to the public and ensure the safety of the patients receiving medication." (Exhibit E at 8-9). The DOH further concluded that Mangini was "incapable of performing the duties of a registered pharmacist . . . competently" based on "the number of significant and dangerous violations he committed in all aspects of practicing as the PDM" and that he was "either unaware of, or disregards, his obligations" and "the laws and rules of the Board of Pharmacy and State of Florida regarding the practice of pharmacy." (*Id.* at 9-10).

[14] ███████████████

defendant's prior brush with law enforcement related to his steroid distribution—for which he served no term of imprisonment but was dishonorably discharged from the Navy—clearly did not dissuade Robinson from engaging in subsequent criminal ventures premised on the same illegal distribution, but on a larger, more elaborate scale, conducted over the course of years and generating millions of dollars of revenue. The defendant's persistent criminal conduct (in defiance of, for example, his dishonorable discharge from the Navy, the pointed findings of the Florida Department of Health, and the FBI's overt investigation into his drug manufacturing business) demonstrate that the Court must impose a sentence of incarceration. As demonstrated by the defendant's criminal history, a non-incarceratory sentence will not deter Robinson and will not adequately protect the public from his criminal persistence.

Given the proliferation of websites such as those operated by Robinson, a significant sentence is warranted for purposes of general deterrence as well. Robinson, his co-conspirators, and others involved in the same activities have enabled the hazardous and illegal administration of unnecessary medications to performance animals with the goal of enriching themselves, and under the assumption that no serious consequences will follow if they are ever caught. Imposing a substantial sentence here would send a strong signal to others thinking of engaging in such criminality that there will be consequences for their crimes.

## Conclusion

The Government respectfully submits that a significant term of incarceration would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing set forth in Title 18, United States Code, Section 3553(a).

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

by: _____
Sarah Mortazavi
Andrew C. Adams
Benet Kearney
Assistant United States Attorneys

cc: William Butler, Esq. (via ECF)