1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                              20 Cr. 162 (JPO)

5    SCOTT ROBINSON,

6                   Defendant.
                                              Sentence
7    ------------------------------x

8                                             New York, N.Y.
                                              March 9, 2021
9                                             11:45 a.m.

10   Before:

11
                        HON. J. PAUL OETKEN,
12
                                              District Judge
13
                             APPEARANCES
14
     AUDREY STRAUSS
15        United States Attorney for the
          Southern District of New York
16   BY:  SARAH MORTAZAVI
          Assistant United States Attorney
17
     WILLIAM M. BUTLER, JR.
18        Attorney for Defendant

19

20

21

22

23

24

25

1              (Case called)

2              THE DEPUTY CLERK:  Starting with the government,

3    counsel, please state your name for the record.

4              MS. MORTAZAVI:  Good morning, your Honor.  This is

5    Sarah Mortazavi for the government.

6              THE COURT:  Good morning.

7              MR. BUTLER:  Good morning, your Honor.  For the

8    record, my name is William Butler.  I'm retained by Scott

9    Robinson, who is seated to my left.

10             THE COURT:  Good morning.

11             Just to confirm, Mr. Butler and Mr. Robinson, you can

12   hear me?

13             MR. BUTLER:  Yes, your Honor.

14             THE COURT:  Can you see me as well?

15             MR. BUTLER:  Yes, your Honor.

16             THE COURT:  We're doing this conference by video, and

17   we're here for sentencing in this case.

18             The defendant pleaded guilty on September 16, 2020, to

19   participating in a drug misbranding and adulteration conspiracy

20   in violation of 18 U.S. Code, Section 3371.

21             We're conducting this proceeding remotely by

22   videoconference, and we've obviously had a bunch of technical

23   issues this morning.  But it looks like we're finally

24   connected.

25             I can see the defendant and defense counsel, and they

1   can see me by video.  And the government, Ms. Mortazavi, is

2   dialed in through an audio connection.

3          Doing this proceeding remotely is authorized by the

4   CARES Act in light of the COVID-19 pandemic and by the chief

5   judge's standing order and her finding that sentencing

6   proceedings cannot be conducted in person without jeopardizing

7   public health and safety, as long as the defendant consents.

8          The defendant has indicated by letter that the

9   defendant wishes to have this proceeding take place remotely by

10  video, and I want to confirm that he consents to that.

11         Mr. Butler, have you spoken to your client about

12  proceeding remotely?

13         MR. BUTLER:  Yes, your Honor, I have.  He does consent

14  to proceeding remotely.

15         THE COURT:  All right.  Thank you.

16         Just to confirm, Mr. Robinson, you've spoken to your

17  lawyer, and you do consent to proceed by video today?

18         THE DEFENDANT:  Yes, I have, your Honor.

19         THE COURT:  All right.  I find that the defendant has

20  consented to proceed remotely.  I also find that this

21  proceeding cannot be further delayed without serious harm to

22  the interests of justice for the same reasons I discussed on

23  the record in connection with the guilty plea hearing,

24  including the significant interest in bringing finality to this

25  case expeditiously, both from the defendant's perspective, as

1  well as the public's interest in final resolution of this

2  matter as to Mr. Robinson.

3          In preparation for sentencing today, I've reviewed the

4  following documents, and I just want to make sure that I've

5  reviewed everything I should have.

6          I've gone through the presentence report with an

7  addendum and sentencing recommendation by the probation

8  department on the file version dated December 4, 2020; the

9  submission by defense counsel dated February 26 with several

10  letters attached from several family members of Mr. Robinson,

11  friends of Mr. Robinson, all of which I've read; and the

12  submission by the government dated March 5.

13          Do I have everything I should have, Ms. Mortazavi?

14          MS. MORTAZAVI:  Yes, your Honor.

15          THE COURT:  And, Mr. Butler?

16          MR. BUTLER:  Yes, your Honor.

17          THE COURT:  Mr. Butler, have you read the presentence

18  report and discussed it with your client?

19          MR. BUTLER:  Yes, your Honor.  I've read it, my client

20  has read it, we've discussed it together, and we find it to be

21  factually accurate.

22          THE COURT:  Thank you.

23          Ms. Mortazavi, have you reviewed the presentence

24  report?

25          MS. MORTAZAVI:  Yes, your Honor, I have.  And the

1  government has no objections.

2          THE COURT:  Thank you.

3          I adopt the facts in the presentence report as my

4  findings of fact for sentencing today.

5          As you all know, the starting point in the federal

6  system for sentencing is the federal sentencing guidelines.

7  The Court is not required to follow the guidelines, but I am

8  required to start with the sentencing guidelines and make sure

9  we have an accurate calculation of the guidelines as an initial

10  benchmark before determining an appropriate sentence.

11          In this case, there was a plea agreement that

12  stipulated to the guideline calculation, and the probation

13  department's calculation is the same.  I believe that is the

14  correct guidelines calculation, and I adopt the calculations

15  set forth in the presentence report as the guideline

16  calculation.

17          The guidelines call for a sentence of five years,

18  which is also the statutory maximum sentence.  There is no

19  mandatory minimum in this case.  So the guideline sentence is a

20  five-year sentence.

21          I'd now like to give you all an opportunity to speak.

22  I'd like to point out that I've read anything.  So you don't

23  need to repeat anything.  Anything you'd like to highlight

24  today, you're welcome to, and I'll start with Mr. Butler for

25  the defendant.

1        MR. BUTLER:  Thank you, your Honor.

2        Your Honor, to begin with, we've obviously read the

3   government's submission.  And there are a couple of points in

4   the government's submission that we take issue with, the first

5   point being the government says that 23 years ago when Scott

6   Robinson was in the Navy that he pled guilty to distributing

7   anabolic steroids.

8        That's not the case, your Honor.  He purchased items

9   that could readily purchased at GNC.  This was during the time

10  of the Mark McGwire home run race.  I don't know if the Court

11  recalls that.

12       That's what he purchased, and that was the substance

13  that he had and that he sold, and that's what happened there.

14  It was not anabolic steroids.  I just want to take issue with

15  what the government put in its memorandum.

16       The other point I have to take issue with is it's been

17  mentioned in the government's memorandum that the substances

18  that Scott Robinson was selling were all through advertisements

19  that said "will not test."

20       "Will not test" we believe -- not we believe.  We

21  know -- is a term of art used in the horse racing industry,

22  used in tack shops all over this country.  When a substance is

23  labeled "will not test," that means it's not going to run afoul

24  of the regulations.  That's what "will not test" means.

25       Earlier, much, much earlier before Scott Robinson was

1    indicted, he explained that to the government when it was

2    interviewing him.  But I don't believe it was taken note of.

3         We maintain that the term "will not test" doesn't mean

4    something illegal will turn up.  It only means that what is in

5    the substance is not going to run afoul of regulations.

6         Other than that, your Honor, I'd like to shift gears

7    and talk about Scott Robinson's history and characteristics

8    pursuant to 18 U.S. Code, Section 3553(a).

9         In doing that, since the Court has read our

10   submission, then it can see and, consistent with the

11   presentence report, Scott has a criminal history of 0.

12        He is a very helpful person.  He's come to the aid of

13   all sorts of people.  Giving him a noncustodial sentence we

14   believe will not diminish what he has entered a guilty plea to.

15        Actually, I could point out to the Court that in

16   another jurisdiction, in fact, in the Sixth Circuit, Tailor

17   Made pharmacy pled guilty to almost the same thing as Scott

18   has, and they only received three months' home detention and

19   three years' probation.

20        So what we're asking for is, I guess, a case where a

21   sentencing disparity might come up.  This is a case where there

22   is no proof that any substance that Scott Robinson had anything

23   to do with selling endangered any race horse anywhere.  No

24   horse became ill or became -- I don't believe died because of

25   anything it had put into it from something that Scott Robinson

1    sold.

2          However, he has admitted his culpability in this

3    adulteration and misbranding conspiracy.  He's entered a

4    guilty plea which reminds me of one other point.

5          The government seemed to make a point that he really

6    wasn't sorry because that wasn't mentioned in the memorandum.

7    Your Honor, I have practiced in roughly ten different federal

8    districts, and I always assumed that it was up to the defendant

9    during his allocution to explain that he was sorry, not for me

10   to explain how sorry he was in my memorandum.  So I didn't do

11   that.

12         If that's the case in New York, I apologize.  But

13   Scott wants to address the Court when the time comes, and I'm

14   sure he'll let the Court know what he thinks.

15         THE COURT:  Let me just ask you, Mr. Butler:  What was

16   the case you mentioned where you said the defendant was

17   sentenced to three months?

18         MR. BUTLER:  Yes, your Honor.

19         (Pause)

20         THE COURT:  The court reporter dropped off.

21         Mr. Butler, we'll have to repeat going back to the

22   point when I said what was that case and do you know the

23   defendant's name.

24         MR. BUTLER:  Your Honor, the defendant's name was

25   Jeremy Delk.  He was the owner of Tailor Made pharmacy.

1          Your Honor, then I was going into the point that the

2    author of the presentence report recommended a 36-month

3    sentence rather than the 60-month and based that recommendation

4    on what I saw as two main points:  One, the amount of money

5    that was earned by Scott Robinson; and two, the obstruction of

6    justice for which he was assessed two points.

7          I mentioned this in the memo, but I'll bring it up

8    again.  As far as the obstruction of justice, Scott used very

9    poor judgment.  When his computer was seized, he wanted his

10   computer back.  And he told the agent that he would email too

11   many people about the investigation.

12         He did not do that.  He apologized to the agent for

13   saying that, and he also apologized to the United States

14   attorney when he was giving his statement.

15         So granted that fits the elements of obstruction

16   attempt.  But I believe that's not something that he should be

17   severely punished for because, A, he didn't do it; and B, he

18   apologized to the agent and apologized to the United States.

19   So that's one thing.

20         The other point is Scott did make a considerable

21   amount of money.  But as noted in the PSR, he filed income

22   taxes on that money each year when he -- on April 15 when it

23   was due.

24         So this is not a case where someone has broken the

25   law, made a ton of money, and no one knew it until he was

1   indicted.  This man paid taxes on the money that was earned.

2   And I think that that should be considered.  Granted, he was

3   guilty of a drug adulteration misbranding conspiracy, but he

4   did pay taxes on this money.

5           And I think those two responses to those two points

6   would allow the Court to give a noncustodial sentence, which

7   would be sufficient but not greater than necessary.  Thank you.

8           THE COURT:  Thank you, Mr. Butler.

9           Before I turn to Mr. Robinson, I'm going to give the

10  government a chance to speak.

11          Again, I've read your submission, as well as the

12  attached information.  But, Ms. Mortazavi, I'm going to give

13  you a chance to respond.  And I may have a couple of questions

14  as well.

15          MS. MORTAZAVI:  Thank you, your Honor.

16          I'd like to respond directly to some of the points

17  that defense counsel has just made and just reiterate some of

18  the points that we did include in our submission, fully mindful

19  of the fact that the Court has reviewed.

20          I think there are some points in particular that we

21  would just like to highlight just based on our view on the

22  egregiousness of some of this conduct.

23          I'm going to take the defendant's comments in order.

24  First, with respect to his claim that the defendant didn't sell

25  steroids in the Navy, that's inconsistent with what he told law

1    enforcement agents when he was asked about his dishonorable

2    discharge from the Navy.  And really, it's beside the point.

3          The point that we were trying to make in our

4    submission is that the defendant was on notice at the time he

5    was in his mid 20's of the type of conduct that would be

6    considered illegal, that would lead to consequences.

7          He faced leniency at that point.  He was not

8    prosecuted.  He was only dishonorably discharged.  However, he

9    should at that point have taken that as a wake-up call and

10   moved away from any sort of criminal activity related to

11   distributing unapproved drugs.

12         Instead, he moved on to more elaborate and more

13   lucrative ventures, including the conduct which underlies the

14   current charges which extends to approximately a decade's worth

15   of distributing misbranded and adulterated drugs.

16         Second, in response to the defendant's claim that the

17   disclaimer "will not test" that was associated with some of the

18   products on the website only meant that those products were

19   somehow in compliance with state racing regulators' rules --

20   that simply does not bear out when you consider them in the

21   context in which Mr. Robinson and his coconspirators marketed

22   those products.

23         They were specifically marketed on websites that were

24   targeted at race horse trainers.  The claims associated with

25   those drugs that were posted on the websites billed them as

1    performance enhancers, for example, very potent blood builders,

2    which is a common performance enhancer that both human and

3    animal athletes use in advance of events or races and that are

4    largely prohibited by many racing jurisdictions specifically

5    because there are very, very few approved uses for those drugs.

6    And yet a blood builder would be advertised on Mr. Robinson's

7    website as one that "will not test."

8            And in particular to Mr. Robinson's case, there were

9    chats where he discussed with his coconspirators the fear that

10   one of his products would test positive and that it would be

11   traced back to them.

12           Taking the sum total of that, although perhaps one

13   could read into "will not test" on the website as indicating

14   that it was compliant, that's not what it said, and that's not

15   what it meant.  Mr. Robinson and his coconspirators knew that

16   when they advertised their drugs.

17           Now, the defense's claim that no horse became ill or

18   died by using one of the products that Mr. Robinson and his

19   coconspirators distributed is flatly wrong.  And we've included

20   as an attachment to our submission some chats in which

21   Mr. Robinson received customer complaints, numerous customer

22   complaints, about unsanitary drugs that he had sold.

23           The customers were reporting that the horses were

24   having adverse effects, including that they appeared to be

25   heavily sedated; that they could not lift their heads; that

1    they could barely walk; that they had fevers.

2         All of these were consequences of the way in which

3    Mr. Robinson conducted his business, which was to allow his

4    drugs to be manufactured in unsanitary facilities, to not seek

5    appropriate testing and regulatory approval to ensure that his

6    drugs were safe, to attempt to conceal his participation and

7    his coconspirators' participation so that it would be more

8    difficult for customers to trace these misbranded drugs back to

9    him with little regard for the risks associated with misbranded

10   and adulterated drugs.

11        Finally, I'd like to speak to the defendant's claim or

12   the defendant's reference to Defendant Jeremy Delk, who is the

13   owner of the company Tailor Made that was recently sentenced in

14   connection with a plea agreement for distribution of

15   adulterated misbranded drugs.

16        In that case, had the government been given the

17   opportunity to do so, we would have responded in more detail,

18   but I'll give the Court some broad strokes.

19        The breadth of the crimes in that case is completely

20   different from what we are facing here with Mr. Robinson.  The

21   conduct in that case was short-lived.  The charged offense

22   lasted from October 2018 to May 2020.  That's less than two

23   years.  Whereas, Mr. Robinson engaged in this conduct for

24   almost a decade.

25        The revenue generated was less than half of what

1   Mr. Robinson generated.  He, over the course of his years of

2   doing business with various conspirators, made close to $4

3   million in sales.  The revenue in that case was only

4   $1.7 million.

5        While there was only one type of drug that was at

6   issue in that case, here, there are scores of various drugs

7   that Mr. Robinson distributed, all of which were illegal, all

8   of which were adulterated and misbranded, all of which were

9   distributed in a manner to defraud or mislead drug regulatory

10  agencies and, specifically, the Florida Department of Health,

11  the FDA, and, to an extent, customers by making it more

12  difficult to trace packages back to Mr. Robinson and to his

13  coconspirators.

14       As I stated, there are numerous drugs that the

15  defendants created and sold.  And whether they were marketed to

16  be performance enhancing with names like Blast Off Extreme

17  injection, Blast Off Red injection, or Numb It injection, which

18  were marketed to have very extreme effects on horses, including

19  to build their blood, lead to increased heart muscle

20  contractions.  Or, as in the case of one injection, was

21  advertised as the most powerful pain shot in the industry.

22       Whether it was those types of drugs or even more

23  innocuous drugs, those that were intended to treat some kind of

24  disease or ailment in a horse, all of them were distributed in

25  a manner to defraud or mislead others.  And the defendant made

1    millions of dollars in revenue in doing so.

2           As I stated, the defendant used unsanitary facilities.

3    His drugs were never approved.  The drugs did not contain the

4    ingredients.  So customers did not know what they were

5    injecting in animals.

6           And they were sold to laypeople, not to veterinarians,

7    to people who did not have the training or the medical

8    expertise to determine what drugs were necessary for a horse or

9    the best way to inject those drugs into a horse.

10           All of that, as I stated briefly, led to increased

11   risk to the ultimate consumers, the horses and the other

12   animals who were receiving these drugs.

13           Your Honor, the points that I want to highlight in my

14   submission are three brief points.  The first is that

15   Mr. Robinson and his coconspirators -- and, to an extent, this

16   distinguishes his conduct from that of Jeremy Delk and Tailor

17   Made -- knew that what they were doing was not legal.  They

18   knew that they could be inspected and shut down by state-run

19   regulatory agencies or the FDA.  So they deliberately tried to

20   act deceptively.

21           This isn't something that they did when it appeared

22   that they would be subject to this federal prosecution,

23   for example.  It was baked into their entire conspiracy.

24           Whether Mr. Robinson was engaging in a conspiracy with

25   one person or another, this was really a fundamental way of

1    doing business for him because he appreciated the illegality of

2    his conduct.

3            Website statements appear to make the product appear

4    to be innocuous as if they were not regulated by the FDA when

5    in fact they absolutely were and are considered drugs under the

6    relevant statutes.

7            Mr. Robinson received customer complaints.  He even

8    himself noticed that bottles were unsanitary, bottles that were

9    being prepared by his coconspirator, Mr. Mangini, as part of

10   their joint venture.

11           He noted to others that there were flies in bottles,

12   that there were black particles floating in bottles, and this

13   was months before he received customer complaints about bad

14   products having adverse effects in horses.  And yet,

15   Mr. Robinson did nothing about it.

16           Several months after that, before the Department of

17   Health conducted an inspection of Mr. Mangini's facility that

18   he was using to manufacture the drugs that Mr. Robinson was

19   then selling -- and as a result of that inspection, which we've

20   quoted in our submission -- and we've attached the report for

21   the Court's review.  So I will not go into it in detail.  But

22   suffice it to say there were numerous violations and serious

23   violations found.  Mr. Mangini's pharmaceutical license was

24   suspended.

25           Mr. Robinson's response to that was, well, the Florida

1   Department of Health has bigger things to worry about than you.

2   He basically shrugged, and he continued.  Even after that

3   occurred in 2016, Mr. Robinson continued to distribute

4   adulterated and misbranded drugs, performance-enhancing drugs

5   targeted to build humans and animals up until his arrest and

6   really up until the search of his most recent offices that he

7   was using to conduct his business, after he parted ways with

8   Mr. Mangini when, in September of 2019, federal law enforcement

9   agents seized many adulterated and misbranded drugs and many of

10  the devices used to create those adulterated and misbranded

11  drugs and seemingly put a halt to Mr. Robinson's business and

12  made it clear that what he was doing was illegal and was on the

13  radar of law enforcement agents.

14          Mr. Robinson's response to that is telling.  Instead

15  of desisting from this conduct, he then reached out to a

16  contact to try to obtain machinery that is designed

17  specifically to create omeprazole paste because he intended to

18  continue his drug adulteration and misbranding activities even

19  though he has a long history of warnings, of indications that

20  what he was doing was wrong, and indications that law

21  enforcement agents were supervising his conduct.

22          Those, your Honor, are some of the many reasons that

23  we think specific deterrence is warranted here and that we

24  think the just punishment counsels in terms of a significant

25  term of imprisonment and why this case is nothing like the case

1    of Jeremy Delk in which defense counsel is relying on here.

2           Mr. Robinson is sophisticated.  He received many

3    warnings over the course of ten years that this type of conduct

4    was illegal.  It was not a momentary lapse in judgment.  And we

5    think that, unfortunately, his conduct up to this point

6    illustrates that he is not contrite or remorseful and that he

7    viewed his conduct as really no big deal and believed that no

8    consequences would follow.

9           And we ask the Court to send a different message, both

10   to Mr. Robinson and to members of the community, that this type

11   of conduct can lead to ill effects, that this type of conduct

12   will not be tolerated and that it is taken seriously by the

13   government and the Court.

14          And, your Honor, I have no further points.  And I'm

15   happy to answer any questions that the Court may have.

16          THE COURT:  Thank you.

17          One question I have is the Jeremy Delk case -- I

18   appreciate the points you made about it being a different and

19   smaller scale and more limited scheme.

20          Do you happen to know whether the charges in that case

21   were misdemeanor charges as opposed to felony charges and

22   perhaps what the guidelines were?

23          MR. BUTLER:  Your Honor, may I respond?

24          THE COURT:  Yes.

25          MR. BUTLER:  They were felony charges.  And Mr. Delk

1   actually distributed more than ten unapproved drugs, more than

2   ten.  And he also destroyed pharmaceutical records to keep

3   agents from finding them.  I should have added that earlier to

4   compare apples to apples.

5          THE COURT:  Does either of you know what his guideline

6   range was?

7          MR. BUTLER:  No, your Honor.  I'm sorry.

8          MS. MORTAZAVI:  This is Sarah Mortazavi for the

9   government.  I do not know his guideline range.  I'm certain we

10  could find it.  I do agree that those were felony charges.

11         I would just like to speak to the point that defense

12  counsel made so that the Court is left with a complete picture

13  of what happened.

14         Defense counsel just referenced the fact that Jeremy

15  Delk destroyed pharmaceutical records in order to deter the

16  investigation and mislead others.  Mr. Robinson also engaged in

17  similar conduct, including putting fake return address labels

18  on shipments that were sent out to customers and in chat

19  communications with his coconspirator, Mr. Mangini, stating

20  that he did so specifically because of security because he

21  didn't want people -- because there was a belief that people

22  were watching that address and that for security purposes, they

23  had to change the return address labels on shipments to

24  customers.

25         That is not like the Jeremy Delk case, an isolated

1    moment of poor judgment and illegality.  That, as I said

2    before, was baked into the very concept of the conspiracy that

3    Mr. Robinson was engaged in.

4            So to the extent the Court is looking at deceptive

5    conduct here, I believe that Mr. Robinson has engaged in much

6    more over a far longer period of time.

7            THE COURT:  Would you also address the issue of

8    relative culpability vis-à-vis Mr. Mangini and also vis-à-vis

9    the other people in the related case that's pending I believe

10   before Judge Vyskocil.

11           MS. MORTAZAVI:  Certainly, your Honor.  I'll take that

12   in reverse order.

13           With respect to the defendants who are pending in the

14   case before Judge Vyskocil, that comprises a very broad group

15   of defendants.  That includes both people who distributed drugs

16   for a much less intense period of time, people who worked for

17   others in distributing drugs and so were employees as opposed

18   to supervisors or managers or leaders, which Mr. Robinson is.

19           That also comprises race horse trainers and

20   veterinarians, which are obviously on quite a different plane.

21   Veterinarians, unlike Mr. Robinson, are licensed.

22           In some cases, those veterinarians, by virtue of the

23   fact that they are licensed, were really selling their licenses

24   in order to allow illegal prescriptions to be issued to cover

25   up the doping that was occurring.

1          And in the case of trainers, they're the ones who are

2     in many instances injecting horses with drugs.  In some cases

3     the defendants who are facing charges in the case before

4     Judge Vyskocil are customers of Mr. Robinson.

5          They received his products, and they administered them

6     to horses.  Whether they received them from him directly; from

7     his coconspirator, Scott Mangini; or from another intermediary.

8          Now, with respect to relative culpability, your Honor,

9     Mr. Robinson has engaged in this conduct for a decade.  That's

10    on par with some of the defendants, including some of the drug

11    manufacturers and people involved in that type of conduct

12    before Judge Vyskocil.  But it is certainly a longer period of

13    time than many of the people who have been charged in that

14    case.

15         So to sum up those two points, your Honor, because I

16    understand I've gone into a little bit of detail about the

17    different categories just to give context.

18         I believe that With respect to Mr. Robinson, the ways

19    in which he is distinct is that unlike many of those

20    defendants, he was engaged in this conduct for a far longer

21    period of time.

22         Unlike many of those defendants, he was also the

23    leader of the conspiracy in that he put in the money, he gave

24    direction, and when he would end the conspiracy with one set of

25    coconspirators, he would start up a new conspiracy with another

1    set of coconspirators -- or pardon me.  He would set up a new

2    venture with another set of coconspirators.

3            So he falls somewhere in the middle with respect to

4    that group of defendants, some of whom are comparable in terms

5    of the extent of their criminality and others which are not.

6            With respect to Mr. Mangini, as the Court is aware,

7    Mr. Mangini is charged in two counts.  The first count relates

8    to Mr. Mangini as coconspirator with Mr. Robinson.

9            But we consider the two on par because Mr. Mangini,

10   just as Mr. Robinson did, after they split ways, continued his

11   conduct, continued his business, and just found a new set of

12   coconspirators and found even more ways to attempt to hide his

13   involvement in the new business.

14           One distinction that I would draw between Mr. Robinson

15   and Mr. Mangini, your Honor, is that Mr. Mangini at one point

16   was licensed by the Florida Department of Health.

17           He held a pharmaceutical license, which means that

18   there is no question that he was aware of the strict

19   regulations that applied -- the need for him to maintain

20   sanitary facilities, the need for him to only sell approved

21   drugs, to have proper paperwork associated with those drugs.

22           And even after his license was suspended, he continued

23   to exercise the same practices that he had before, even though

24   he was unlicensed.  Many of their conduct is the same.

25           Many of the ways in which they tried to obscure their

1   participation in their respective businesses are the same, and

2   they both had leadership roles in their respective

3   conspiracies.

4          The one distinction that I would draw is the one that

5   I have just highlighted, which is the fact that Mr. Mangini,

6   unlike Mr. Robinson, was at one point licensed to engage in

7   this business.

8          THE COURT:  All right.  Thank you.

9          Only one other question.  And that is, just in

10  thinking at a high level about this case, I've been trying to

11  puzzle through the harm.

12         I understand your point about the misleading of

13  regulators, federal and state health regulators, and perhaps

14  race horse regulators as well and that being relevant and

15  important for the reason of promoting respect for the law and

16  so forth.

17         And then there's the issue of harm to animals, which

18  you've highlighted.  And then you also mention harm to

19  customers or the misleading of customers.

20         And I'm a little confused about whether I should think

21  of those customers as, well, coconspirators, sort of in on the

22  deal, sort of people who were wink, nudge buying these

23  materials, buying these drugs because they knew exactly that

24  they were performance-enhancing drugs, which is something that

25  the government has seemed to suggest sort of being in on it,

1   or, on the other hand, being victims who are misled.

2          If you could sort of clarify or shed any light on that

3   issue.

4          MS. MORTAZAVI:  Certainly, your Honor.  The reason for

5   those different strands is because these products were so

6   widely marketed and sold with no restriction.  Many similar

7   legally run websites will have Rx requirements and will require

8   that a vet submit a prescription or that a prescription be

9   uploaded.

10         That's not what Mr. Robinson did.  What he did was

11  sell to everybody and anybody.  For example, some of the other

12  blood builders, the potent pain relievers -- it's very clear

13  that there is, as the Court put it, a wink, wink, nudge, nudge

14  relationship with the customer where everyone understands that

15  what is being sold is a performance-enhancing drug and everyone

16  understands what the phrase "will not test" means.

17         But there were a number of customers who were not in

18  the race horse industry, a number of customers who purchased

19  drugs, other than those I've highlighted.  And the fact that

20  there were not details associated with those products to allow

21  those customers to evaluate what was in them and whether it is

22  appropriate for the horse is an issue.

23         For example, a drug will be listed as having a

24  proprietary blend of ingredients, which gives the consumer

25  really no basis to know what is in the drug, how it's going to

1  react with the horse, how it was manufactured.

2         Similarly, as I pointed out a few minutes ago, there

3  were a number of customers who put in complaints because the

4  products that they received were having adverse effects on

5  horses.

6         Now, those customers did not know that there were poor

7  manufacturing practices being exercised.  They thought that

8  they were potentially buying valid, legitimate drugs.

9         And there were disclaimers associated with many of the

10 products on the website that were designed to mislead agencies

11 but could easily have misled consumers that state things like,

12 these statements have not been evaluated by the Food and Drug

13 Administration and it is not intended to diagnose, treat, cure,

14 or prevent any disease, statements that seem to imply that the

15 drugs that are being sold, even though they are injectables,

16 are in fact a supplemental source of vitamins.

17        That is profoundly misleading.  For someone who isn't

18 sophisticated enough to know what is going on on a website like

19 horseprerace.com, there is a drug sold that is intended to

20 build the blood of a horse.

21        I understand that I've categorized broadly two

22 different types of customers.  I think the danger is that there

23 are those in the race horse industry who know exactly what is

24 happening who are purchasing these drugs for a very particular

25 purpose, and Mr. Robinson is aware of that, based on the

1    marketing of the drugs and the name of the website.

2            And there are other people who perhaps own horses who

3    have no interest in the race horse industry who pick up one of

4    these products assuming that it is legitimate, assuming that it

5    is not a drug that requires FDA approval, it is not a drug that

6    is different from a vitamin injected in a horse.  And that

7    could lead to deleterious effects.  So we view that in two

8    ways.

9            Your Honor, if I may, briefly.  As to my points

10   earlier, the Court had asked if we were aware of the guidelines

11   range of Jeremy Delk, and I was able to briefly check.  And the

12   guidelines range, consistent with the points that I made

13   earlier regarding the extent of the conduct, are completely

14   different.

15           The guidelines range in that case was an offense level

16   of 8, and I believe there were no criminal history points,

17   which is a far cry from the guidelines that are here where they

18   are so high that they are essentially capped out at the

19   statutory max of 60 months.

20           And that just further illustrates that relying on the

21   conduct for Jeremy Delk is really no guidance for the Court

22   whatsoever when it comes to Mr. Robinson's conduct.

23           THE COURT:  That's odd that it would be an offense

24   level of 8 if he was making in the millions of dollars.  It

25   seems like somehow the calculation must have been done

1    differently with respect to financial gain.  Right?

2              MR. BUTLER:  Your Honor, may I jump in?

3              THE COURT:  Let me just let Ms. Mortazavi answer that

4    if she wants, and then you'll be able to jump in.

5              MS. MORTAZAVI:  Your Honor, I think that may be right.

6    The $1.7 million that I quoted was based on the revenue of the

7    company and the forfeiture amount that was ordered in

8    connection with the sentencing.

9              And I am attempting to find out the calculation of the

10   guidelines range.  I'm happy to inform the Court of it.  But

11   certainly it looks like that $1.7 million was not included in

12   the offense level.

13             THE COURT:  Okay.  Thank you.

14             Mr. Butler.

15             MR. BUTLER:  Thank you.

16             Your Honor, 18 of the 29 points on Scott Robinson's

17   offense level were due to the amount of money earned.  The

18   Court has just been referring to that.  Over $3.5 million was

19   counted against Scott Robinson.

20             And that's why he ended up with 29.  That was 18

21   points.  Otherwise, he would have been at a level 6 getting two

22   points -- I'll stop right there.  But the big point is 18

23   points really, really changes the calculus here or the risk I

24   think I should say from if you take 29 and subtract 18 from it,

25   and you've got 11.  So he's in the same ballpark as Mr. Delk.

1   That's one thing.

2            The other point I wanted to make, your Honor -- I got

3   it right here.  The United States is talking about harm to

4   animals.  The United States has not interviewed any owners.

5   The harm it's talking about is gleaned from emails that were

6   sent to Scott Robinson.  There are no interviews of any

7   victims.

8            The United States doesn't know that customers were

9   misled.  There is no one popping up here saying, I was misled.

10  I was misled.  We're just speculating.  I think that's

11  important to take into account.

12           THE COURT:  Okay.  Thank you.

13           MS. MORTAZAVI:  Your Honor, if I may, this is Sarah

14  Mortazavi.

15           THE COURT:  Yes.

16           MS. MORTAZAVI:  I hate to go back and forth on this,

17  but because the Court has asked questions about the guidelines

18  range with respect to Mr. Delk, I'd like to point out that I

19  have a version of the plea agreement that I'm happy to

20  distribute to the Court and defense counsel if you would like

21  to review it.

22           But it appears in the plea agreement that the parties

23  did not agree to calculate the guidelines based on Section

24  2B1.1 for basic economic offenses.  I want to make clear that

25  the parties have a plea agreement here and a stipulated

1    guidelines range.  Defense counsel took no issue with the fact

2    that we applied 2B1.1 and agreed in that calculation.

3          Instead, Section 2M1.1 of the guidelines was applied,

4    which involves tampering with consumer products.  So I think

5    that is the basis for the low guidelines range, which includes

6    a base offense level of 6 points for leadership and 10 points

7    for obstruction of justice.

8          THE COURT:  Right.  I'm looking at the Department of

9    Justice press release on the case from the Eastern District of

10   Kentucky.  The $1.7 million was the amount that was forfeited

11   by Tailor Made pharmacy.

12         There is no indication of financial amounts for Delk

13   because, as you noted, that was a different part of the

14   guidelines that was used.  In any event, it is what it is.

15         Thanks.  I think you've answered my questions, and I

16   want to thank counsel for their helpful submissions and remarks

17   today.

18         I'd like to give Mr. Robinson an opportunity to speak.

19   You're not required to, but if you would like to speak before

20   sentencing, you may do so now.

21         THE DEFENDANT:  Yes, your Honor.  Are you able to hear

22   me, your Honor?

23         THE COURT:  Yes.

24         THE DEFENDANT:  Your Honor, I want to thank you for

25   this opportunity to speak to you today.  I first want to

1  apologize to the government of the United States for causing

2  this issue.

3         Secondly, I'd like to apologize to my family and

4  friends for putting them through this.  And lastly and mostly,

5  I want to apologize to the horse racing industry.

6         Horse racing is the only thing in my life that I have

7  ever truly loved.  From the first time I was made to go to the

8  racetrack, I fell in deep love with horse racing, and this

9  negative attention is not what I'm about.  And I sincerely

10 apologize for that.

11        For the last 15 years plus, I've promoted horse racing

12 and tried to increase its popularity.  I take full

13 responsibility for the actions I have taken.  Along with my

14 coconspirator, Scott Mangini, we created omeprazole paste

15 formula together.

16        In the beginning, we were featured in horse magazines.

17 Our products sold at most tack shops all across the

18 United States.  We even shipped our products to the sheik of

19 Dubai.

20        Being that omeprazole was over the counter and not

21 banned by any sport or horse racing, I thought it was okay.  I

22 even consulted with my now deceased former lawyer, Barry Cohen.

23        I wasn't strong enough to say no because I was getting

24 the answers I wanted to hear.  I was naive to the fact that it

25 was wrong in the beginning.  Scott Mangini was a licensed

1   pharmacist.  And in the beginning, he had me convinced that

2   what we were doing was okay since UlcerGard, our competitive

3   product, was sold over the counter.

4           Once I received the warning letter from the FDA in

5   2014, I realized it was wrong, what we were doing.  But I was

6   too weak to stop the business.  In 2015, I stopped doing

7   business with Scott Mangini and began pursuing a generic

8   approval for omeprazole paste through an FDA-approved

9   laboratory called PharmaTech.

10          I spent nearly $2.7 million of my own money doing

11  studies and testing to get a new abbreviated drug animal

12  application, which I have in these books right here.

13          These are all the studies that I've done and that the

14  laboratory has done, all the pharmacology, all the safety and

15  efficacy testing.  I am within six months of getting FDA

16  approval on omeprazole paste if I'm able to finish.

17          During this time of getting this abbreviated drug

18  animal application, I was told by the CEO, Ray Figueroa, that I

19  could give omeprazole paste out as samples.  Once again, I

20  never questioned him.

21          During this process, PharmaTech went out of business,

22  and I lost my entire investment.  The only thing I have to show

23  for it are these seven volumes of studies and lab work showing

24  that omeprazole is safe and not a performance-enhancing drug.

25          Omeprazole is not banned by the Olympics or WADA, the

1  World Anti-Doping Agency.  I also have a bill showing I paid

2  $2.7 million for this research over a four- to five-year

3  period.

4       Although not one horse was hurt by what I did with the

5  omeprazole paste, the victim in this matter was horse racing.

6  Horse racing is a giant sport.  For as much as I have tried to

7  bring positive attention to the sport by donating money,

8  gifting horses to celebrities, this whole incident has ruined

9  all that I have done.

10       For this, I apologize with all my heart to all of the

11  people in horse racing -- the grooms, the trainers, the owners,

12  the drivers, and even track personnel.

13       If you see fit to sentence me to prison or probation,

14  I will abide by the rules 100 percent and use the time

15  constructively.  Whatever I decide to do in the future will be

16  100 percent legal with absolutely no question of breaking the

17  law.

18       I now ask more than one person -- and I trust very few

19  people.  I have recently started an Amazon business that is

20  growing by the month.  I'm also trying to work with a doctor to

21  open an alternative medicine clinic to help people with chronic

22  illness.

23       Also, while I serve my time, be it in prison or

24  probation, I would like to continue my mental health work or my

25  CTE, chronic traumatic encephalopathy.

1          With my psychologist and my psychiatrist, along with

2    my own studies, we have made some headway in delaying the onset

3    of Alzheimer's, dementia, and Parkinson's-like symptoms.

4          With the use of my own hyperbaric chamber, I have had

5    great success in eliminating my headaches, my tremors, and an

6    overall sense of well-being.  In the past four years, I have

7    developed sleep apnea and have to wear a CPAP machine to sleep

8    at all times.

9          My mental health has caused me problems for the last

10   20-plus years, and it has to change.  And I feel like this

11   incident has made me focus on getting better even more so.

12         I will ask you to allow me to continue my mental

13   health treatment.  Without my medication, I still have anxiety,

14   tremors, headaches, rapid mood swings.  I know there is no

15   known cure for my condition, but I just have to do my best

16   every day and take my medication.

17         Your Honor, I know I've done wrong, but I've tried my

18   best to take care of my mother who has cancer, my father who is

19   nearly crippled, and I've set up college funds for my niece and

20   nephew.

21         I've taken care of my friends and horse racing by

22   donating water trucks and sponsoring races at numerous race

23   tracks.  I've tried to help out anyone in need in horse racing.

24   I've donated money to Standardbred Retirement Foundation,

25   disabled jockeys, and even announcers.

1          Many times my trainers have had problems that I've

2    helped them with, whether it be personal or with the horses.  I

3    sponsored dog kennels for homeless dogs, and I also sponsor 20

4    foster children at Christmas every year.  I'm fortunate.  I do

5    everything I can for the less fortunate.

6          Your Honor, I have never hurt an animal.  Nor would I.

7    That I can say with 100 percent certainty.  I have never met an

8    animal or a horse that I don't get along with.

9          Thank you for letting me speak.  I would like to say

10   so very much more on this serious issue, but I've touched upon

11   the important issues.

12         If there are any questions you'd like to ask of me, I

13   would be more than willing to answer them now.

14         THE COURT:  Thank you, Mr. Robinson.

15         Let me just ask counsel if there is anything else or

16   if there is any reason I cannot proceed to sentencing at this

17   point.

18         MR. BUTLER:  No, your Honor, not on behalf of the

19   defense.

20         THE COURT:  Thank you.

21         Ms. Mortazavi?

22         MS. MORTAZAVI:  Nothing from the government.  Thank

23   you, your Honor.

24         THE COURT:  In preparing to sentence the defendant,

25   I've considered the presentence report and the recommendation

1  of probation, which recommends a sentence of 36 months'

2  imprisonment.

3          I've considered the written and oral statements of

4  defense counsel and the defendant and the government and all of

5  the letters submitted in support of the defendant.

6          And I've considered all of the factors in the statute,

7  Section 3553(a) of Title 18, which of course includes the

8  sentencing guidelines but also various other factors -- the

9  nature and circumstances of the crime, the defendant's history

10  and characteristics, and the purposes of sentencing, that is,

11  the need to reflect the seriousness of the offense; to promote

12  respect for the law; and to provide just punishment; the need

13  to afford adequate deterrence and to protect the public; and

14  the need for any training and treatment.

15          I'm required to impose a sentence that is sufficient

16  but not greater than necessary to comply with the purposes in

17  the statute.

18          The criminal conduct here was serious.  The defendant

19  engaged in a scheme to market and sell misbranded and

20  adulterated drugs across the country, including

21  performance-enhancing drugs to race horse trainers and others.

22          These drugs were not tested or approved by the FDA.

23  They were not properly labeled and were not distributed

24  pursuant to prescriptions.  In some cases, they were

25  manufactured in unsanitary facilities and, in some cases,

1   likely to cause harm to the animals they were intended for.

2        The defendant made a significant amount of money,

3   millions of dollars, in this scheme over the course of ten

4   years through various websites and business entities.  This was

5   not a momentary lapse of judgment.  It continued for many

6   years.

7        With respect to the defendant's history and

8   characteristics, that also must be considered.  The defendant

9   is a 46-year-old man who has no prior convictions.

10       The lack of prior convictions is relevant, although

11  the importance of that consideration is lessened, to some

12  extent, by the extended period of criminal conduct here and by

13  the fact that the defendant continued engaging in this conduct,

14  in some ways, even after he became aware that federal and state

15  governments were looking into it.  He also has certain medical

16  issues that are properly taken into account in arriving at an

17  appropriate sentence.

18       I think the BOP does have the ability to make sure you

19  have proper medication and proper treatment, although someone

20  with medical issues faces a more difficult time in prison than

21  someone who doesn't.  And I'm aware of that and take it into

22  account.

23       And the many letters submitted in support of

24  Mr. Robinson highlight that he is, in many ways, a good person

25  who has contributed positively to his community and those

1  around him.

2         The letters describe him as generous and helpful to

3  others.  A person's criminal conduct does not completely define

4  that person, and that should be taken into consideration as

5  well.

6         Balancing these considerations, I do conclude that

7  this is a sufficiently serious crime that extended over a

8  lengthy period of time such that serious punishment is

9  warranted.

10        One of the sentencing purposes, promoting respect for

11 the law, I think is important and salient in this case.  This

12 entire business was in some ways designed to evade federal law,

13 as well as state laws.  And I think that's important.

14        I also think the defendant's obstruction is troubling.

15 Although it was a momentary lapse of judgment, that aspect of

16 it, the defendant basically threatened the FBI agents with

17 blowing up the investigation, although he did apologize later,

18 as defense counsel has pointed out.  But that is, again,

19 suggesting conduct that really flouts the law and disrespects

20 the law.

21        In addition to reflecting the seriousness of the

22 offense and promoting respect for the law, the goals of

23 specific and general deterrence play an important role here.

24 People need to realize that this sort of criminal conduct will

25 be taken seriously.

1          Now, weighing those considerations against the

2    mitigating factors I mentioned, the lack of criminal history

3    and the other positive personal characteristics and medical

4    challenges, I do agree with probation that a variance below the

5    sentencing guidelines is appropriate and warranted.

6          I don't think a five-year sentence is needed to serve

7    the purposes that I mentioned.  I also think that a 36-month

8    sentence is greater than necessary to serve those purposes.

9          Weighing everything I've mentioned, I believe that a

10   sentence of 18 months' imprisonment is an appropriate sentence

11   and is sufficient to meet the characteristics while taking into

12   account the positive factors I've mentioned.

13         Therefore, I intend to sentence the defendant to 18

14   months' imprisonment followed by three years of supervised

15   release.

16         Does defense counsel know of any legal reason that

17   sentence may not be imposed?

18         MR. BUTLER:  No, your Honor.

19         THE COURT:  Does the government know of any legal

20   reason that sentence may not be imposed?

21         MS. MORTAZAVI:  No, your Honor.

22         THE COURT:  Mr. Robinson, it is the judgment of this

23   Court that you be sentenced to the custody of the

24   Bureau of Prisons for a period of 18 months.

25         Following release, you'll be placed on supervised

1    release for three years with the following conditions:

2              You will not commit another federal, state, or local

3    crime.

4              You will not possess or use an illegal controlled

5    substance.  You will submit to one drug testing within 15 days

6    of placement on supervised release and at least two drug tests

7    thereafter as directed by probation.

8              You will not possess a firearm or destructive device.

9              You will cooperate with the collection of DNA as

10   directed by the probation officer.

11             The standard conditions are imposed with the following

12   special conditions:

13             You will submit your person, residence, place of

14   business, vehicle, and any property, or electronic devices

15   under your control to a search on the basis that probation has

16   a reasonable suspicion that contraband or evidence of a

17   violation may be found.

18             The search must be conducted at a reasonable time and

19   in a reasonable manner.  Failure to submit to a search may be

20   grounds for revocation, and you shall warn any other residents

21   that the premises may be subject to search.

22             You shall provide probation with access to any

23   requested financial information.

24             You shall not incur any new credit charges or open

25   additional lines of credit without the approval of the

1   probation officer.

2          You will participate in an outpatient substance abuse

3   treatment program approved by probation which may include

4   testing to determine whether you've reverted to using drugs or

5   alcohol.

6          You shall contribute to the cost of services rendered

7   based on ability to pay or the availability of third-party

8   payment.

9          And the Court authorizes the release of drug treatment

10  evaluations and reports, including the presentence report, to

11  the substance abuse provider.

12         You shall also participate in an outpatient mental

13  health treatment program approved by the probation office.

14         And you shall continue to take any prescribed

15  medications, unless instructed by the health care provider.

16         And the other terms will be identical to the substance

17  abuse treatment program, including the release of evaluations

18  and reports to the health care provider.

19         If the probation officer determines, based on your

20  record, personal history, and characteristics, that you pose a

21  risk to another person, including an organization, the

22  probation officer, with prior approval of the Court, may

23  require you to notify the person about the risk and comply with

24  that instruction.

25         The probation officer may contact the person and

1  confirm that you have notified the person about the risk.

2        You shall report to the nearest probation office

3  within 72 hours of release, and I recommend that you be

4  supervised by the district of your residence.

5        I am not imposing a fine because the probation

6  department reports that you're not in a position to pay a fine.

7  However, there is a $100 special assessment which is hereby

8  imposed.

9        As agreed in the plea agreement and as stated in the

10  preliminary order of forfeiture, you shall forfeit to the

11  United States the sum of $3,832,318.90.  $3,832,318.90.

12        I'll hear from the parties on a surrender date.

13        Do you have a preference, Mr. Butler, on a surrender

14  date?

15        MR. BUTLER:  Yes, your Honor.  Scott had a doctor's

16  appointment with his neurosurgeon yesterday.  The Court may

17  recall that a couple months ago he had complicated neck

18  surgery.

19        Apparently one of the screws is coming out a little

20  bit, and his physician has told him that he needs to wear a

21  bone-growth stimulator for four hours a day for the next three

22  months to hopefully make the bone heal there on the screw.

23        Because of that, it's our motion to allow him to

24  report, since that will take three months -- after three

25  months, he'll have X-rays on his neck again.

 1            I wonder if the Court would allow him to report in six

 2     months.  I know that's a long report date, but given the fact

 3     that he's had serious surgery and he needs time to heal from

 4     that, that's our request.

 5            THE COURT:  Ms. Mortazavi, would the government like

 6     to address that?

 7            MS. MORTAZAVI:  Your Honor, under the circumstances

 8     and given Mr. Robinson's medical issues, the government does

 9     not object to that proposed surrender date.

10            THE COURT:  All right.  So you said six months.

11            MR. BUTLER:  Yes, your Honor.

12            THE COURT:  So September?

13            MR. BUTLER:  Yes.  Also, your Honor, I understand that

14     you can't order the Bureau of Prisons to place him anywhere in

15     particular, but I ask that you recommend a facility as close to

16     his home as possible.

17            THE COURT:  His home in Florida?

18            MR. BUTLER:  Yes.  In Tampa, Florida.

19            THE COURT:  In the Tampa area.  Okay.  With respect to

20     a surrender date, I'm ordering that the defendant surrender to

21     the facility designated by the Bureau of Prisons on

22     September 7, Tuesday, September 7, 2021, before 2:00 p.m.

23            With respect to designating a facility, I can only

24     make a recommendation.  The Bureau of Prisons ultimately has

25     the authority to decide.  But I will make a recommendation that

1   he be designated to a facility as near as possible to the

2   Tampa, Florida, area to facilitate visitation.

3           With respect to forfeiture, Ms. Mortazavi, can you

4   remind me.  Is there already a forfeiture order, a preliminary

5   order, signed?

6           MS. MORTAZAVI:  Yes, your Honor.  It's at ECF number

7   30.

8           THE COURT:  Thank you.

9           Mr. Robinson, I want to advise you of your appeal

10  rights.  You have the right to appeal from your conviction and

11  sentence, except to the extent you have waived that right as

12  part of your guilty plea and plea agreement.

13          If you cannot pay the costs of an appeal, you may

14  apply for leave to appeal without payment of costs.  An appeal

15  must be filed within 14 days of the filing of the judgment, and

16  a complete copy of the presentence report will be provided to

17  the BOP and Sentencing Commission.

18          Are there any open underlying counts that the

19  government seeks dismissal of?

20          MS. MORTAZAVI:  There is an underlying indictment,

21  your Honor, that the government moves to dismiss.

22          THE COURT:  All right.  The underlying indictment is

23  hereby dismissed.

24          Anything further from the government?

25          MS. MORTAZAVI:  Nothing from the government.  Thank

1   you, your Honor.

2            THE COURT:  Anything further from Mr. Butler?

3            MR. BUTLER:  No, your Honor.  Thank you.

4            THE COURT:  Okay.  Thank you very much.  This matter

5   is adjourned.

6            (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25